COLONIAL TRUST CO. et al. v. PACIFIC PACKING & NAVIGATION CO.

CORBY v. SAME.

(Circuit Court of Appeals, Third Circuit. November 27, 1907.)

No. 22.

**1. BROKERS—RIGHT TO COMMISSIONS—CONSTRUCTION OF CONTRACT.**

Under a contract with receivers by which a broker was authorized to "offer and sell" the stock of salmon of a canning company, with a provision that the sales were to be subject to the receivers' instructions and confirmation, he was not required to procure an offer but a purchaser, and was entitled to the stipulated commission if he was the efficient means of procuring a purchaser whose offer, made directly to the receivers, was accepted, and to whom a sale was made.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, § 74.]

**2. SAME—EARNING OF COMMISSION.**

That a principal is ignorant of the efforts of his broker in procuring a customer does not affect the broker's right to a commission.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, § 74.]

**3. SAME.**

To entitle a broker to his commission on a sale, it is not necessary that he should be present and an active participator in the making of the sale, but it is sufficient if he procured the purchaser who makes the purchase on any terms agreed to between the parties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, § 74.]

**4. SAME—TRANSFER OF PROPERTY TO CORPORATION.**

Where petitioner, as a broker, being authorized thereto by a contract with defendants as receivers of a canning company who were located at Seattle, entered into negotiations in New York for the sale of the company's stock of canned salmon with persons who were interested in another corporation engaged in a similar business, and two of whom were respectively the president and general manager thereof, and assisted in arranging for funds to enable them to make the purchase, and as a direct result of such negotiations the president of the corporation went to Seattle and with petitioner's knowledge and consent made the purchase by direct negotiations with the receivers, the fact that the sale and transfer were made to the corporation and not to the individuals did not affect plaintiff's right to the commission which was to be paid him under his contract.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Brokers, § 74.]

5. SAME—WAIVER OF CLAIM TO COMMISSIONS.
     Delay on the part of a broker in presenting to receivers his claim for
commissions on a sale effected by him, to which he was entitled under a
contract, *held,* under the facts shown, not to have operated as a waiver of
such claim.

Appeal from the Circuit Court of the United States for the District
of New Jersey.

For opinion below, see 142 Fed. 298.

Wallace Macfarland, for appellant.
Clifford P. Williamson, for appellees.

Before DALLAS and GRAY, Circuit Judges, and CROSS, District
Judge.

CROSS, District Judge. On the 11th day of February, 1905, the
petitioner, Charles Corby, a broker and commission merchant for the
sale of canned salmon, fruits, and other Pacific Coast products, entered
into a contract in writing with the receivers of the Pacific Packing &
Navigation Company, the material parts of which are as follows:

"We authorize you to offer and sell our present stock of canned salmon on the
following terms, to wit:

"First—All sales to be made subject to our instructions, as to selling price
from time to time and upon the customary terms for domestic sales, except
that in lieu of the usual guarantee on swells an arbitrary allowance to be
made not to exceed ½ of 1%.

"Second—All sales to be made subject to our confirmation.

"Third—We reserve the right to sell to anyone where offer made is satisfac-
tory to us and without any compensation to you; in view, however, of your
undertaking to handle this salmon and that you will incur some expense there-
in, we will not solicit business from other brokers for sixty days from the
date hereof, but this shall not be construed to prevent our negotiating the sale
of any large blocks of salmon either domestic or foreign without liability here-
under.

"Fourth—You will not knowingly sell for shipment to Great Britain either
directly or indirectly prior to June 30th of the present year.

"Fifth—Your commission for sales to be 4% on the net f. o. b. price in lots of
10,000 cases or under and 2% in lots of 11,000 cases or over to any one buyer or
combination of buyers.

"Sixth—This agreement may be cancelled by the receivers at the end of sixty
days from date."

Pursuant to the foregoing contract, the petitioner claims that he per-
formed services which entitled him to recover from the receivers a
commission of 2 per cent. on the sum of $440,433.50, the price for
which the receivers, whose office was in Seattle, Wash., sold their
stock of Red Alaska salmon to the Northwestern Fisheries Company,
whose office was also in Seattle. After ineffectual efforts in San Fran-
cisco and Chicago to sell the salmon, the petitioner arrived in New
York about March 2, 1905, and almost immediately thereafter open-
ed negotiations for its sale with certain persons named Churchill, Sat-
terlee, Jarvis, and Rosene, who were then interested in the Northwest-
ern Fisheries Company, the corporation which subsequently bought the
salmon. The more important facts connected with the negotiations and
sale will appear herein later.

There is no question that Corby, in the course of the negotiations
with the parties above referred to, devoted much time and performed

much labor in an endeavor to effect a sale of the salmon. Indeed, the more active of the receivers in his testimony says:

"I will tell the court this, that if I had had in mind that Corby had been active and as active as his own testimony shows he was in making this sale, I never would have allowed a sale to be consummated or would not have consummated one as receiver, that would not have provided for his commission."

The decision of the learned judge who heard the case in the Circuit Court is predicated upon a finding that the petitioner did not perform the conditions precedent prescribed in his contract, and that his failure in this respect lay in his not having obtained and submitted to the receivers an offer which they were willing to accept. It is true that a broker may, by agreement with his principal, so contract as to make his compensation depend upon a contingency which his efforts cannot control, even though it relates to the acts of his principal. Hinds v. Henry, 36 N. J. Law, 328; Walker v. Tirrell, 101 Mass. 257, 3 Am. Rep. 352. In other words, he is bound by his contract, even though it be a hard one. It becomes important, therefore, to inquire at the outset what, under the circumstances, Corby was required to do in order to earn his commission. By its terms he was authorized to "offer and sell" the salmon, with the provision that the "sales" were to be subject to the receiver's instructions and confirmation. These expressions, however, do not mean that the receiver was in fact required to make a sale; he could not do that; he did not have the power. The right to fix prices and terms having been reserved to the receivers, the authority given to Corby was in effect to offer the salmon for sale and find a party willing to buy upon terms satisfactory to them. We do not deem that it was at all essential that the broker himself should submit a proposition of sale directly to the receivers. He was not authorized by his contract to submit any binding proposition to a possible purchaser. He had no discretionary control of the price. His duty was limited to finding a satisfactory purchaser. A proposition submitted by him and accepted, or modified and accepted, by the receivers, unquestionably entitled him to a commission. If however, instead of submitting the purchaser's offer to the receivers, he induced the purchaser himself to go to the receivers and submit an offer, directly, which was acceptable, he would have done everything in substance that the contract required him to do; he would have found a customer able and willing to purchase upon terms satisfactory to his principal. The essence of the contract was not that Corby should procure an offer, but a purchaser, for the salmon. But assuming that he was required to procure and submit an offer, it will not be questioned that the broker could have submitted such offer by telegram, letter, messenger, or otherwise, and still have been within the literal terms of his contract. We reach the conclusion, therefore, that under the terms of this contract it was a matter of indifference that the petitioner did not obtain from his customer and transmit directly to the receivers an offer for the salmon. It made no possible difference to the receivers how or through whom the offer was submitted; hence, if Corby found an acceptable purchaser, he as fully and satisfactorily complied with the contract by sending him to the receivers to submit his offer as he would

by submitting the offer to the receivers in person. The real question in the case is, therefore, was the broker the efficient or procuring cause of the sale? which is the question uniformly presented in this class of cases.

But it is further urged on behalf of the receivers that at the time they sold the salmon to the Northwestern Fisheries Company they had no knowledge that Mr. Corby had conducted prior negotiations with the officers of that company for the sale of the salmon. The broker's right to a commission, however, does not rest at all upon that proposition. That a principal is ignorant of the efforts of his broker in procuring a customer does not affect the question of the broker's right to a commission. A broker may be the procuring cause of a sale within the meaning of the authorities, although his principal at the time be wholly ignorant of that fact. In Sussdorff v. Schmidt et al., 55 N. Y. 319, the court said:

"The undertaking of the broker is to make efforts to procure a purchaser, but if he fails he is entitled to no pay unless there is a special contract. But if the purchaser is found by his efforts and through his instrumentality he is entitled to compensation, although the owner negotiates the sale himself. (Lloyd v. Matthews, 51 N. Y. 124). Nor is it indispensable that the purchaser should be introduced to the owner by the broker, nor that the broker should be personally acquainted with the purchaser; but in such cases it must affirmatively appear that the purchaser was induced to apply to the owner through the means employed by the broker. * * *

"It did not appear that the defendants knew that Eckersdorff and Marwig came to purchase in consequence of information obtained through the plaintiff, and it may be that this fact, if it existed, was designedly withheld from them so as to secure commissions for Eckersdorff. However that may be, it is not conclusive against the plaintiff. If he was the producing cause of this sale, his right to compensation would not be affected by the circumstances that the defendants were ignorant of it at the time, nor should he be prejudiced by the acts of others."

To the same effect is Lloyd v. Matthews, 51 N. Y. 124. In Graves v. Bains and Woodman, 78 Tex. 92, 14 S. W. 256, it is said:

"If an agent be authorized to make a sale of land and a purchaser is procured by him, he is entitled to his commissions, and it is of no consequence that the owner did not know of the fact and made the sale himself."

Again, in Bryan v. Abert, 3 App. D. C. 180, it is held that, where a broker who is authorized by an owner to find a purchaser at a certain price is the procuring cause of a sale made by the owner, he is entitled to his commissions, even though the owner is ignorant of it at the time and sells for a price and upon terms different from those fixed in his contract with the broker. So, too, in Adams v. Decker, 34 Ill. App. 17, and Kelly v. Stone, 94 Iowa, 316, 62 N. W. 842, it is held that the fact that the owner has not been notified that the purchaser had been sent to him by his agent is immaterial. See, also, Millan et al. v. Porter, 31 Mo. App. 563; Tyler v. Farr, 52 Mo. 249; and Ross v. Muskowitz (Tex. Civ. App.) 95 S. W. 86. Nor, again, does it affect the broker's right to a commission that he did not complete or was not present at the completion of the sale made by the principal to the broker's customer. This proposition is thoroughly established, and reference will be made to but a few of the many au-

thorities supporting it.   In Sibbald v. Bethlehem Iron Company, 83 N. Y. 378, at page 382, 38 Am. Rep. 441, the court says:

"In Wylie v. Marine National Bank, 61 N. Y. 416, it was held that, to entitle the broker to commissions, he must produce a purchaser ready and willing to enter into a contract on the employer's terms. This implies and involved the agreement of buyer and seller, the meeting of their minds, produced by the agency of the broker. In Moses v. Bierling, 31 N. Y. 462, it was declared that the authorities clearly establish the proposition that, until the broker has faithfully discharged the obligation assumed in the contract with his principal, he is not entitled to his agreed commission, and that obligation is fulfilled only when he produces a party ready to make the purchase at a satisfactory price. In Glentworth v. Luther, 21 Barb. 147, it was declared that commissions were earned when the broker produces to his principal a party with whom the owner is satisfied, and who contracts for the purchase at an acceptable price. It was not meant by these cases, and we do not mean, that the broker must of necessity be present and an active participator in the agreement of buyer and seller when that agreement is actually concluded. He may just as effectually produce and create the agreement, though absent when it is completed and taking no part in the arrangement of its final details."

See, also, Hoadley v. Savings Bank, 71 Conn. 599, 42 Atl. 667, 44 L. R. A. 321 ; Vreeland v. Vetterlein, 33 N. J. Law, 247 ; Keys v. Johnson, 68 Pa. 42 ; McMillin v. Beves, 77 C. C. A. 444, 147 Fed. 218 ; French v. McKay, 181 Mass. 485, 63 N. E. 1068.   In the last case cited, a broker had brought about an exchange of real estate; the deal, however, was concluded without him, and the defendant sought to be relieved from the payment of commissions because the property he had received in exchange was not the same which was under consideration when the plaintiff was last seen in the transaction.   The defense however, was not sustained.

From what has been said, it is apparent, as already intimated, that the real questions presented in this class of cases are, was there an employment of the broker, and, if so, was he the efficient or procuring cause of the sale?   These facts once established, it is of no consequence whatever whether the broker was present or absent at the conclusion of the sale, or whether the sale was concluded upon the same or different terms than those originally proposed, or whether or not the principal had knowledge of the broker's agency in procuring the customer. Since Corby's employment as a broker in this matter cannot be gainsaid, we may turn at once to a consideration of the evidence with a view to ascertaining just what Corby's relation was to the sale in question, and whether he was its efficient or procuring cause.   It should be kept in mind that Churchill, Satterlee, Jarvis, and Rosene, with whom Corby negotiated in New York, were at that time interested in the Northwestern Fisheries Company, which became the purchaser, and it further appears that Mr. Rosene was its president and Mr. Jarvis its general manager.   In the course of the negotiations Corby submitted to these men an offer which he represented as one which he thought the receivers would consider favorably, but which it ultimately appeared was slightly less than the one accepted by them.   The receivers were from time to time informed by Corby of his efforts to procure an offer for the salmon; he, however, never submitted one directly.   His main obstacle, and the one which seems to have caused most of the delay, was the procurement of the funds necessary to

finance the operation. Pending the negotiation, however, $100,000 in cash were provided in New York, and Corby was informed of the fact, and it then became necessary to finance the balance of the operation on the Pacific Coast. At the suggestion of Messrs. Churchill and Satterlee, Corby thereupon opened negotiations for that purpose with one Kelly at Seattle, who was his friend and the head of a large and influential brokerage firm at that city. The proposition was that Kelly should arrange with certain banking houses on the Pacific Coast to advance upon the security of the salmon the difference between the $100,000 raised in New York and the price at which the salmon could be purchased. Kelly was also made acquainted by Corby with the negotiations in New York, and at his instance became actively associated with the New York parties above mentioned, and subsequently on March 17th completed arrangements with certain banks whereby the necessary funds were to be forthcoming when required. While these arrangements were in progress, the receivers were in a general way apprised of them by Corby, although he did not disclose the names of his customers. On March 18th the receivers wrote Corby a letter in which the following statement appears: "There is absolutely no change in conditions since you left here." On the 21st Corby telegraphed them in substance that the financial arrangements were about completed; that some details, however, were unfinished, but he was confident that he could submit a firm offer in a day or two. On the 22d he wrote them that he expected to be able to wire a definite proposition not later than Friday, and he hoped on the following day, and on the 23d he wrote them a letter of similar import. When all the arrangements had been completed for the purchase of the salmon by the parties in New York, upon the terms suggested by Corby, Churchill informed Corby that he thought before making the offer he would better await the arrival at Seattle of Mr. Rosene, who had left New York for that city. Accordingly, Corby telegraphed Kelly: "Have effected financial arrangements here, see Rosene and help things along." On March 22d Satterlee telegraphed Rosene at Seattle that the plan to buy the salmon had been perfected. The receipt of this telegram was acknowledged by Rosene March 23d, and on the 27th he telegraphed Satterlee that he had not yet agreed with the receivers upon a price, but thought the financial arrangements were satisfactory. On the 25th, Messrs. Churchill and Satterlee told Corby they were prepared to make the offer he had suggested, but had decided to make it directly to the receivers through Mr. Rosene, who had then arrived at Seattle. Mr. Corby thereupon, on March 25th, sent to the receivers the following telegram: "Interested parties here advise Rosene will make their offer Red Alaska salmon direct. Please telegraph at once, as soon as deal is completed." There was a slight but unimportant error in the transmission of this telegram, but as received it notified the receivers that Rosene would make an offer for the salmon direct, and they were requested to telegraph as soon as the deal was completed. This telegram was received at the office of the receivers in Seattle by their managing clerk in charge thereof. On March 29th Rosene telegraphed Satterlee that he had purchased the salmon, and on the 30th the receivers telegraphed Corby that the deal was closed, and that particulars would be

sent by mail. Jarvis co-operated with Rosene at Seattle in making the purchase. It satisfactorily appears from the testimony that the negotiations by Kelly, Jarvis, and Rosene at Seattle were but a continuation of the negotiations which were opened and assiduously carried on by Corby in New York, and that the financial arrangements made in New York and at Seattle were availed of in making payment of the purchase price of the salmon. We have no question that the taking of the title to the salmon by the Northwestern Fisheries Company was understood, and arranged by the parties with whom Corby negotiated. Pending the negotiations at Seattle between the receivers and Rosene and Kelly, Rosene was in constant communication with Mr. Satterlee, one of the associates in New York, as appears by the telegrams above referred to; and in a letter dated March 28th, the day before the deal was closed, he wrote him a letter, in which, after referring to an offer that the receivers had refused, he says: "Inasmuch as we had previously agreed that we would give as high as 90c. per dozen for this fish, subject to the discounts above stated, we finally made that offer but it was also refused." This quotation seems to show conclusively that Rosene was making the offer for himself and his New York associates. He referred to it as an offer which they had previously agreed upon, and it was in fact the same offer which Corby had suggested might be satisfactory to the receivers. Kelly testifies that, in his negotiations with the banks and Mr. Rosene in respect to the purchase of the salmon, he represented the individuals of the syndicate and the Northwestern Fisheries Company, and Satterlee swears that he became interested in the matter as a result of Corby's interviews with him, and that Corby was the inducing cause which operated on his mind to persuade him to go into the enterprise. Furthermore, the Northwestern Fisheries Company, the purchaser of the salmon, had previously bought from the receivers not only the canneries of the Pacific Packing and Navigation Company, but also the trade-marks on the boxes of salmon which were sold, and it was therefore but natural that the transfer should be made to that company. We have by no means referred to all the testimony bearing upon this point; it is sufficient to say that we are convinced therefrom that the transfer was made to the Northwestern Fisheries Company in compliance with the understanding of the individuals interested in the purchase, and that the petitioner is no less entitled to his commission than he would have been had the transfer been made directly to the individuals with whom he negotiated. In the case of Brooks v. Leathers, 112 Mich. 463, 70 N. W. 1099, it was held that a real estate broker employed to sell land, and who had negotiated with a corporation for its purchase, was entitled to a commission upon a sale made by the owner to one of the stockholders of the corporation where the latter was influenced to make the purchase by the broker's efforts to sell to the corporation.

The case at bar is the converse of the one just cited. Authority, however, would seem to be unnecessary to support the proposition that a broker who has earned a commission cannot be deprived of it because at the last moment the purchaser decides to have the deed made, and it is accordingly made, to a third party. Under the facts disclosed in this case, it was unimportant, so far as the petitioner's rights are

concerned, whether the transfer was made to the associates who were all interested in the purchasing corporation, or to the corporation itself. The broker's services were in either case equally valuable and efficient; he was the procuring cause of the sale, and substantially complied with the terms of his contract.

Before concluding, however, it seems proper to refer specifically to two or three points which have been raised in behalf of the receivers. The first is that, prior to the sale of the salmon, the petitioner assumed a position where his interests were hostile to and conflicted with those of the receivers, and that consequently he cannot recover. This defense was apparently an afterthought. The receivers' answer to the petitioner's petition is full and explicit, but no such defense as is now presented was therein set up or even suggested; consequently the petitioner had no notice that the point now made would be raised, hence it may readily be seen that whatever proofs there are which seemingly bear upon the question might easily have escaped attention, and remained in part uncontraverted or unexplained. But that aside, the change is substantially one of fraud or bad faith on the part of the broker, and the burden of proof to substantiate it rests upon the receivers. This burden they have not sustained. Such evidence as relates to the question is, we think, easily explicable upon a theory not inconsistent with the good faith of the agent. It certainly falls far short of satisfying us of his bad faith.

Another point urged is that the receivers had reserved to themselves the right to sell the salmon, and that pursuant thereto they found the purchaser and independently conducted the negotiations which resulted in the sale. Upon this point the proofs are likewise vague and wholly inconclusive. It appears that about the middle of March one of the receivers approached the secretary of the Northwestern Fisheries Company, in Seattle, and had several "talks" with him before Rosene arrived at that place, but it should be recalled in this connection that on the 18th of that month the receivers wrote Corby that "there is absolutely no change in conditions since you left here." Furthermore, it does not appear what the "talks" were, how far they progressed, if they did progress, or what authority, if any, the secretary had in the premises. It does appear, however—and this is important—that they took place some time after Corby had opened his negotiations in New York with the very persons who, as we have seen, ultimately, to all intents and purposes, became the purchasers of the salmon.

Only one other suggestion remains which requires special consideration. It is to the effect that Corby himself recognized that he had no claim upon the receivers for commissions in the matter, because he made no demand therefor until between two and three months after the transaction was closed. Corby did, however, on March 31st, and immediately after the receipt by him of the receivers' telegram, announcing that the deal with Rosene had been closed, write a letter to the receivers in which he expressed his gratification that the negotiations which were opened and carried on by him in New York had finally culminated in the disposition of the salmon; and on April 4th he wrote them another letter in which he indirectly refers to the fact that he

carried on with Rosene, Churchill, Satterlee, and others the negotiation for the sale of the salmon. On the 28th of June following, in a friendly letter concerning his compensation, in which, however, he made no arbitrary demand upon the receivers, he said: "Under the agreement I would be justly entitled to 2% upon the amount of the sale." Moreover, it appears that Corby had been in the employ of the insolvent corporation, was well known to Kerr, and that they were good friends. The receivers, however, more particularly rely upon the fact that at an interview between Kerr and Corby, held on the 5th day of April in New York, at which some other matters were adjusted, no reference was made by Corby to any claim for commissions in respect to the sale of the salmon. Mr. Kerr says that the matter of the sale was discussed; Corby says it was only incidently referred to, and that the reason the subject of his commissions was not taken up was because the time was wholly occupied in the settlement of outside matters, and that another interview was arranged between them for the following day, which Kerr, however, did not keep, but went west with his daughter that afternoon, and consequently he had no further opportunity of seeing him. This statement of Corby's is not directly denied by Kerr, and it would seem to afford ample explanation, if any were necessary, why the matter of commissions was not discussed at the previous interview. We would certainly not be warranted under the evidence in holding that Corby had impaired, much less waived or abandoned, his right to a commission. There is ample justification in the facts presented for Corby's dilatoriness, if such it was, in presenting his claim or in not presenting it in a more formal and decisive manner than it was presented. Corby was not a lawyer, and may not have understood his rights; at all events, we would not be justified in inferring from the evidence that he at any time waived his claim against the receivers. If his rights to compensation were seriously in doubt, the point urged would be entitled to more consideration.

We think the decree of the Circuit Court should be reversed, and one entered directing the receivers to pay to the petitioner the sum of $8,808.67, with interest thereon from March 30, 1905, besides costs.