Argued October 9, decided October 21, rehearing denied November 25, 1913.

# SLOTBOOM *v.* SIMPSON LUMBER CO.*

### (135 Pac. 889: 136 Pac. 641.)

**Brokers—Contract—Oral Modification.**

1.  Under Section 808, L. O. L., providing that an agreement authorizing or employing an agent or broker to sell or purchase realty for compensation or a commission shall be void unless in writing and subscribed by the party to be charged, an oral modification of a writing authorizing a broker to secure a purchaser for property, made after the expiration of the time limited in the original writing for securing a purchaser, would be unenforceable.

**Brokers—Actions—Sufficiency of Evidence.**

2.  Evidence, in an action to recover a commission for procuring a purchaser for realty pursuant to written authority, *held* to show at most an attempted oral ratification of the services performed by the broker in securing a purchaser and an oral promise by the owner to pay for the benefit received as a commission a percentage of the bid made for the property if the offer were accepted.

**Brokers—Ratification.**

3.  Since the original authority to procure a purchaser for land on commission must have been in writing, a ratification of an oral modification of such written agreement must also be evidenced by writing.

**Brokers—Contract—Time.**

4.  Where the period within which a real estate broker was authorized to procure a purchaser was definitely limited by the written contract, the time so specified was of the essence of the contract.

**Brokers—Contract—Termination of Employment.**

5.  The agency of a real estate broker whose employment is definitely limited by his contract terminates with the expiration of the time specified unless the time is extended by another agreement executed within the time specified in the original contract.

---

*On the question of the necessity that agent's authority to purchase or sell real property be in writing, to enable him to recover compensation for his services, see notes in 44 L. R. A. 601 and 9 L. R. A. (N. S.) 933; and as to the power of the legislature to require contracts for commissions for finding a purchaser for real estate to be in writing, see note in 33 L. R. A. (N. S.) 973.

Upon the lapse of time as terminating authority of real estate broker, see note in 16 L. R. A. (N. S.) 431.

As to the effect upon the right to commission of fact that owner sells to broker's customer at reduced price, see notes in 15 L. R. A. (N. S.) 272 and 34 L. R. A. (N. S.) 1050.

On the question when real estate broker is considered as procuring cause of sale or exchange, see note in 44 L. R. A. 321.        REPORTER.

Brokers—Performance of Contract—Introduction of Purchaser.

6.  A broker earns his commissions upon introducing a proposed purchaser to the owner, though a sale is made to such purchaser for a less sum or upon different terms than those originally contemplated.

Brokers—Commissions—Performance by Broker.

7.  Where property is sold, after the expiration of the time limited for the procuring of a purchaser, by a third person and upon different terms, the original broker is not entitled to commissions.

Brokers—Commissions—Sale After Time.

8.  A broker is not entitled to commissions upon a sale of the property by the owner after the time allowed the broker for procuring a purchaser, though the sale resulted from efforts to procure a purchaser, begun before the expiration of such time.

Brokers—Commissions—Change of Terms by Owner.

9.  A broker who has fully performed his part of the contract is entitled to his commissions though the owner afterward changes his mind as to making the sale or imposes additional terms so as to postpone a transfer until after the time limited to the broker for making the sale.

Brokers—Performance by Broker—Delay in Concluding Sale—Negligence of Owner.

10.  The fact that a broker was prevented, by the intoxication of the owner's agent, from informing the corporate owner, before the expiration of the time limited for procuring a purchaser, of the fact that a purchaser was procured would not entitle the broker to recover commissions on the theory that the owner was charged with its agent's neglect.

> [As to when a real estate broker has earned his commission, see note in 139 Am. St. Rep. 225.  As to right of broker to commissions on sale made by owner, see note in Ann. Cas. 1913D, 821.]

From Multnomah: Henry E. McGinn, Judge.

Department 1.    Statement by Mr. Justice Moore.

This is an action by W. L. Slotboom against the Simpson Lumber Company, a corporation, to recover money.  The original complaint charges in effect that on December 12, 1911, the defendant, a corporation, by a written instrument, employed the plaintiff, a real estate broker, to sell for it about 460 lots in North Bend, Oregon, according to the plat thereof, stipulating to pay him 5 per cent of the sum realized if he secured a purchaser who was ready, able and willing to pay $90,000 for the property.  That pursuant to

such employment the plaintiff entered into negotiations for the sale of the land with William J. Wilsey with whom the defendant on April 27, 1912, and within the time limited by such instrument, voluntarily concluded a bargain for the sale of the premises for $75,000. That by reason of the premises the plaintiff is entitled to a commission of 5 per cent of that sum, or $3,750, no part of which has been paid.

The answer denied the material averments of the complaint, and at a trial of such issues the plaintiff was permitted, over objection and exception, to file an amended complaint, alleging in substance the making of the written instrument whereby the time in which a sale might be perfected was set at January 1, 1912, which limit was extended by a writing to the 15th of that month. That between January 14, 1912, and February 25th of that year the defendant, by its legally authorized agent, L. J. Simpson, and the plaintiff orally modified the terms of the written instrument whereby the plaintiff was authorized to secure a purchaser of the lots for $75,000 and in consideration thereof the defendant agreed to pay plaintiff a commission of 5 per cent of that sum. That, pursuant to the written instrument as modified, a bargain was concluded by plaintiff's efforts and the real property was sold to Wilsey, within the time limited, for $75,000, by reason whereof the plaintiff is entitled to $3,750 for his services, which sum the defendant upon a demand therefor refused to pay. By stipulation the answer filed was treated as controverting the averments of the amended complaint. The trial having been concluded, the plaintiff secured a judgment for the sum demanded, and the defendant appeals.                REVERSED.

For appellant there was a brief over the names of *Messrs. Johnson & Beckwith* and *Mr. Lee Parsons,* with an oral argument by *Mr. J. A. Beckwith.*

For respondent there was a brief with oral arguments by *Mr. A. L. Dundas* and *Mr. G. E. Hamaker.*

Mr. Justice Moore delivered the opinion of the court.

It is contended by defendant's counsel that the amended complaint, averring the original written instrument was modified by a subsequent oral agreement, reducing the price demanded for a sale of the lots and extending the time in which to secure a purchaser of the premises, did not state facts sufficient to constitute a cause of action; and, this being so, errors were committed in receiving, over objection and exception, testimony tending to substantiate such allegation and in refusing to grant a judgment of nonsuit, after the plaintiff had introduced his evidence in chief and rested.

1. The question to be considered is whether or not, under the rule adopted in this state, a written contract, within the statute of frauds, can be modified by a subsequent oral agreement. Our statute of frauds was amended February 9, 1909 (Laws Or. 1909, c. 27), by adding another subdivision, and the altered enactment as far as material herein now reads: "In the following cases the agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents, in the cases prescribed by law. * * (8) An agreement entered into subsequent to the taking effect of this act, authorizing or employing an agent or broker to sell or purchase real estate for compensation or a commission": Section 808, L. O. L.

In *Neppach* v. *Oregon etc. R. Co.,* 46 Or. 374, 394 (80 Pac. 482, 7 Ann. Cas. 1035), it was held that a party to a written contract for the sale of land, who know-

ingly gives oral consent to a postponement of the performance of some material provision that is of benefit to the one consenting, will not be permitted to insist, after the other party has acted on the modified agreement, that such contract is void because not written, or allowed to enforce the contract as originally made, even though time and the prompt performance of the deferred condition were made essential by the terms of the writing. In that case Mr. Justice BEAN adverts to the contrariety of judicial utterance on the question under consideration, commencing with the first announcement of the legal principle in *Cuff* v. *Penn,* 1 Maule & S. 21, showing the exception to the English statute (29 Car. II, c. 3), enacted in 1677 and commonly designated as the statute of frauds, though not now regarded as controlling in Great Britain, prevails in many states of the Union, saying: "In this country the cases are in conflict. Some of the courts, notably of Massachusetts, have followed *Cuff* v. *Penn,* making a distinction between the contract, which the statute requires to be in writing, and the time of performance, to which it is held the statute does not apply. The courts in other states, and probably a majority, deny the validity of such an agreement, unless acted upon by the parties, and hold that a part of a contract required by the statute to be in writing cannot rest in parol."

The case of *Neppach* v. *Oregon etc. R. Co.,* 46 Or. 374 (80 Pac. 782), is also reported in 7 Ann. Cas. 1035, in a note to which it is said: "Following the rule laid down in the reported case, it has been held in a number of cases that evidence of an oral agreement altering the terms of a written contract within the statute of frauds, while not evidence of an enforceable agreement, is admissible to establish a waiver of the terms of the written contract, where it appears that the contract as

altered has been acted upon by the party offering the evidence.''

The precept thus adopted in this state is controlling, if the facts established at the trial bring the case at bar within the rule so promulgated. The testimony shows that the plaintiff, having learned that the defendant's lots in North Bend, Oregon, were for sale, visited that place and called upon L. J. Simpson, a director in the defendant company and its agent, who on December 12, 1911, wrote Slotboom as follows:

''Confirming conversation held in this office yesterday, we beg to quote you on the following described property situated in the city of North Bend, and in the Western addition to the city of North Bend, according to the plats thereof on file in the office of the county clerk of Coos County, for the sum of $90,000 cash, less a commission of 5 per cent to you. Should your parties desire any other terms than the cash proposition above, kindly notify us of the same and we will give it consideration. It is understood that this proposition is for immediate acceptance. We will consider that this option is an option which shall extend only until the 1st day of January, and that if you have not decided to take this property at that date, that you will have no further right of purchase in the matter. We are inclosing in to-day's mail a map upon which we have marked in red all of the lots covered by this option which we propose to sell. Herewith follows a description of the property''—giving a detail of the lots and blocks.

L. J. Simpson, on December 26, 1911, wired Slotboom as follows: ''You can have ten days from to-day in which to bring your party to North Bend and can give answer then.''

Simpson on January 2, 1912, telegraphed the plaintiff as follows: ''You can have ten days further time in which to give answer.''

Slotboom on January 5, 1912, in company with William J. Wilsey, the contemplated purchaser of the lots, visited and carefully examined the real property, but owing to Mr. Simpson's indisposition they were unable to transact any business with him, though they visited North Bend to buy the real property. Simpson on February 8, 1912, went to Portland, Oregon, and in company with the plaintiff called at the office of Wilsey, who then offered $75,000 in cash for the lots. Simpson replied that he would confer with his associates in San Francisco and notify Wilsey of the conclusion they might reach in the matter.

Slotboom testified that, leaving Wilsey's office, he returned to a hotel with Simpson, whom he urged to accept the offer thus made, saying to the defendant's agent: "That is a very good deal and you are getting spot cash. That is a very fine proposition for you. Of course, the fact of the price being reduced somewhat will reduce my commission." The witness was then asked: "What do you say as to whether or not he then said that he would pay you your commission?" He replied: "Yes, he agreed to pay me a commission. He made no objection whatever. He agreed that I should have a commission."

The offer made for the lots by Wilsey was accepted and pursuant thereto the defendant on February 24, 1912, executed a deed of the real property to the purchaser. Owing, however, to some slight defects in the title, as disclosed by the abstract, a delay was occasioned in correcting the imperfections in the record of the transfers, necessitating a postponement in the payment of the consideration for the premises and a delivery of the deed to the purchaser. In the meantime, to wit, on March 18, 1912, L. J. Simpson telegraphed Slotboom, saying in part: "Wired Wilsey several times about lot deal. Can you tell me where he is and when I can expect to hear from him?"

The deposition of H. C. Diers, a real estate broker of North Bend, Oregon, having been taken pursuant to a stipulation herein, was read in evidence, a part of which sworn statement is as follows: "That on January 30, 1912, William J. Wilsey sent me a telegram requesting me to get lowest cash on lots in question. I went to see L. J. Simpson and got the price, which I wired to William J. Wilsey, as follows: 'Price of North Bend lots $80,000 net cash and no commission allowed.' I advised Mr. Simpson to go to Portland and take the matter up with Mr. Wilsey, which he did."

L. J. Simpson corroborates the testimony of Diers, saying: "That is the first intimation I had of Mr. Wilsey's being a prospective purchaser." Simpson further testified that, when Wilsey made to him the offer to buy the lots, the witness in the presence of Slotboom said, "I wanted it expressly understood that if the property sold for $75,000 that there was no commission paid to anyone." In referring to the sworn statement of the plaintiff respecting the return from Wilsey's office as hereinbefore set forth, the witness also testified: "I believe I went to the Portland Hotel with Mr. Slotboom, but I have no recollection of discussing the commission with him at all. I don't know that we even discussed the matter of selling the property." On cross-examination, in referring to the plaintiff's efforts to secure a purchaser of the property, Simpson was asked: "And you recognized at the time Mr. Slotboom was doing what he could for you to put this deal through for you?" The witness replied: "I did; yes, sir. Q. That is the reason he came to the hotel for you and went with you up to Wilsey's office? A. Yes, sir." In referring to the telegram which he sent to Slotboom March 18, 1912, with respect to the sale of the lots, Simpson testified as follows: "I had sent a number of wires to him in connection

with it. The money hadn't been paid over. I understood the bids had been sent to Portland. I believe Mr. Wilsey was not there at the time. Knowing that Mr. Slotboom was quite friendly and well acquainted with Mr. Wilsey, I believed he was the proper man to tell me where I could reach Mr. Wilsey by wire. That is simply a request on my part to have Slotboom let me know where Mr. Wilsey was.''

2. Conceding plaintiff's testimony in each particular to be true, the most that can be claimed for it is an attempted ratification of the services performed by the broker in securing a purchaser and an oral promise made by the defendant's agent to pay for the benefit received as a commission a percentage of the bid made for the property if the offer were accepted.

In *Sorenson* v. *Smith,* 65 Or. 78 (129 Pac. 757, 760), it is said: ''When an enactment expressly declares that an agreement for the payment of a commission for securing a purchaser of land is void unless it is in writing and signed by the owner of the real property, the rule is well established that, in the absence of a written contract, a full performance of the services by the broker does not take the case out of the statute of frauds.''

3. The attempted ratification herein not having been evidenced by a writing was insufficient in law, for, since the original authority must have been in writing, the ratification to be valid must be evidenced also in the same manner: 31 Cyc. 1264.

4. The original option given by Simpson as subsequently extended expired January 15, 1912, and, the period having been thus definitely limited, the time so specified was of the essence of the contract: *Watson* v. *Brooks,* 11 Or. 271 (3 Pac. 679); *Hardy* v. *Sheedy,* 58 Or. 195 (113 Pac. 1133).

5. Where a broker's employment is thus definitely settled, his agency terminates with the expiration of

the time specified: *Zeimer* v. *Antisoll*, 75 Cal. 509 (17 Pac. 642). An exception to this general rule is stated in the amended complaint and is admitted to be a correct expression of the law in Oregon that if the written memorandum authorizing a sale of real property had been modified by an oral agreement entered into prior to January 15, 1912, extending the time of performance, such alteration would have been valid: *Neppach* v. *Oregon etc. R. Co.*, 46 Or. 374 (80 Pac. 482, 7 Ann. Cas. 1035). Any modification of the authority conferred upon the plaintiff by the written instrument, to secure a purchaser of the property, after the expiration of the time thus limited, was a new contract, which agreement, under our statute of frauds, was required to be evidenced in writing. A careful examination of all the testimony fails to show any such oral modification of the original writing was consummated prior to January 15, 1912, and during the existence of the time of the option as extended. The evidence failed to substantiate the averment of the complaint in this particular, and, such being the case, an error was committed in refusing to grant the nonsuit.

The judgment should be reversed and the action dismissed, and it is so ordered.          Reversed.

Mr. Chief Justice McBride, Mr. Justice Burnett and Mr. Justice Ramsey concur.

Denied November 25, 1913.

## ON PETITION FOR REHEARING.

(136 Pac. 641.)

MR. JUSTICE MOORE delivered the opinion of the court.

In a petition for a rehearing it is maintained by plaintiff's counsel that on January 5, 1912, and prior to the expiration of the time limited, their client went from Portland, Oregon, to North Bend, in this state, with William J. Wilsey, the proposed purchaser, to whom the town lots were subsequently sold, and though they did not on that occasion see the defendant's agent, L. J. Simpson, because of his extreme state of intoxication, Slotboom had thus secured a purchaser who was able, ready and willing to buy the real property to secure which the journey was made, and such being the case the broker earned his commission, in refusing to grant which an error was committed by this court. As Wilsey paid only $75,000 for the land which the plaintiff was authorized to sell for $90,000, it is not reasonable to suppose the purchaser would have paid the sum first demanded.

6. Whatever amount of money Wilsey would have given for the real property January 5, 1912, is not important, for the rule is well settled that, when a proposed purchaser has been introduced to the owner by a broker, the latter has earned his commission, though a sale is made to the person so produced for a less sum or upon different terms than originally suggested: Walker, Law R. E. Agency, §§ 450, 502, 532.

7. Where, however, after the expiration of the time limited, a sale of property is made by a third person with new incidents, the broker is not entitled to a commission: *Lunney* v. *Healey,* 56 Neb. 313 (76 N. W. 558,

44 L. R. A. 593); *Beauchamp* v. *Higgins,* 20 Mo. App. 514.

8. In the case at bar the testimony shows that the first information the defendant's agent obtained that Wilsey desired to purchase the lots was on January 30, 1913, when H. C. Diers, pursuant to a telegram from Wilsey, inquired of Simpson the lowest cash price that would be accepted for the land, and at Diers' suggestion Simpson went to Portland to confer with Wilsey about the matter. This was after the expiration of the time allowed the plaintiff to procure a purchaser, and in such case a broker is not entitled to a commission because efforts begun within that time bore fruit after its expiration: Mechem, Ag., § 965; 19 Cyc. 254. If, therefore, a recovery of a commission can be had herein, it must be predicated upon the ground that within the time specified the broker induced a person to take the property, but the delay in closing the sale was caused by the negligence, fault or fraud of the defendant.

9. If a real estate broker fully performs his contract, he cannot be prevented from recovering his commission because the owner subsequently changes his mind about making the sale or imposes such additional terms as to postpone a transfer of the title until after the expiration of the time limited: *Brackenridge* v. *Claridge & Payne,* 91 Tex. 527 (44 S. W. 819, 43 L. R. A. 593). There must be no breach of faith by the owner of property toward the broker who has been employed to secure a purchaser thereof.

10. It must be kept in mind that the defendant herein is a corporation and that L. J. Simpson is one of its directors and that neither the principal nor such agent was notified prior to January 15, 1912, when plaintiff's contract expired, that Wilsey had been secured as a purchaser. If Simpson's inebriety was adopted as a means of preventing a sale of the lots within the time

limited, however liable he might be personally for the consequences of his conduct on January 5, 1912, it is difficult to perceive by what rule of law the defendant was bound by his deportment on that occasion. The doctrine of *respondeat superior* applies to a corporation for its agent's torts resulting from negligence caused by his drunkenness. No such rule, however, can be invoked because the agent in consequence of his inebriety failed to effect a contract binding upon his principal.

The petition for a rehearing should be denied, and it is so ordered.        REVERSED: REHEARING DENIED.