[No. 12580.  Department One.  September 30, 1915.]

PHILIP J. BRADY, *Respondent*, v. ADMIRALTY TRADING COMPANY, *Appellant*.[1]

BROKERS—COMMISSIONS—CONTRACT — LIMIT — TIME FOR PERFORMANCE.  Upon an agreement to pay a broker's commission if he could make a sale of a salmon pack upon that day, time is of the essence of the contract, and there is no liability for the commission where the broker was unable to consummate the deal on that day, and was not prevented by any act of the vendor, although four days later a sale was consummated without the intervention of the broker.

Appeal from a judgment of the superior court for King county, Mackintosh, J., entered September 28, 1914, upon findings in favor of the plaintiff, in an action on contract, tried to the court.  Reversed.

*Bamford A. Robb*, for appellant.

*Kerr & McCord*, for respondent.

ELLIS, J.—This is an action to recover a commission on a sale of canned salmon.  The plaintiff is a salmon broker.  The defendant is a salmon packer.  The cause was tried to the court without a jury.  Judgment was entered in favor of the plaintiff for $386.60, with interest and costs.  Defendant appeals.

The cause is here for a trial *de novo*.  Since we cannot agree with the conclusion reached by the trial court, we shall, following our usual custom, discuss the evidence.  It is not

[1]Reported in 151 Pac. 1084.

voluminous, and we therefore set it out almost in its entirety as it appears in the abstract, which we have verified by a careful reading of the statement of facts.

The respondent testified as follows:

"I have been in business as a salmon broker in Seattle for about twenty years and am acquainted with the defendant, Admiralty Trading Company, who furnished me, in the fall of 1913, with two sample cases of salmon. I sent samples of the salmon to James R. Baker, Chicago, Illinois, about November, 1913. I had some of these samples in my office which I showed Mr. Baker on February 5, 1914, and I gave him a price on the entire lot of salmon of the defendant then in Seattle, amounting to 3,788 cases, which Baker was willing to buy. There were 5,700 cases more in Alaska. I took his offer to the office of the Admiralty Trading Company, and conversed with Mr. Teal, the general manager of the defendant, about Baker's offer. Mr. Teal said that he would not sell the salmon in Seattle alone, but would make a sale if the salmon in Alaska were included. I made out a memorandum of the Seattle and Alaska stock in Mr. Teal's office and gave him a copy of it and I marked on Mr. Teal's copy '1½% commission to Brady.' I took the letter which I had prepared to Mr. Baker at the Seattle Hotel, who said: 'I do not want the Alaska lot now, but I will keep my offer on the Seattle lot.' I went back to the office of the Admiralty Trading Co. and repeated Mr. Baker's offer to them. Mr. Teal said he would not break the lot, but he would let Mr. Baker have both lots. The company authorized me to consummate this sale to Baker, but I do not think they permitted me to close the deal. When I went to the hotel the second time I stated to Mr. Baker that the company would not break the lots; Baker refused to go further with the deal and would not take the Alaska lot. I went back to the Admiralty Company and told them Baker would not take both lots, and I presumed that ended the deal on that day. . . .

"This was the only finished deal I ever had directly for the company in regard to salmon. Baker sent me to the office of the defendant to make an offer; they wanted Baker to take both lots of salmon and they would not yield from their position. The last time I went to the office of the Admiralty Trading Co. on February 5th, I believe that I said to them

this deal with Baker was off, and if they had no kick coming
I would go and sell to some one else.  I do not recollect of-
fering to buy it—I may have done so."

The letter and memorandum referred to by the witness
reads as follows:

"Seattle, Wash. Feb. 5, 1914.

"Mr. James R. Baker & Co., Chicago, Ill., care James R.
    Baker, Seattle:

"Dear Sirs: I beg to offer you, for reply today, the entire
spot stock of canned salmon belonging to the Admiralty
Trading Co., on the following terms prices and conditioned
upon taking the entire parcel:

Seattle Stock:

 3788 cases 1 lb. Tall Pink Gunner brand at 62½c dozen
  695 cases " " Med. Reds " 82½c "
       (Quartermaster Brand)

  20 " " Red Alaska Marine brand at 115 c "
  21 " " Tall Chums, Seaman brand " 60 c "

Alaska Stock:

 5067 cases 1 lb. Tall Pinks Gunner brand at 62½c "

 "Prices are F. O. B. Seattle.

"Terms are sight draft against documents less 1½% and
2% Commission the Seattle lot to be drawn on at once and
the Alaska lot as soon as the goods can be brought to Se-
attle.

"Quality is fully guaranteed as provided for in the usual
salmon contract, as to swell etc.

"1000 cases more Gunner Pinks are under option until
tonight, which if not sold will be added to above Seattle
stock and will be added to above sale.

"Yours very truly,
"Philip J. Brady,
"Phil J. Brady

"On the above deal the Com. to Brady is agreed as 1½%
Com."

George C. Teal, appellant's manager, testified as follows:

"Mr. Brady came to our office on the 5th day of Febru-
ary, 1914, and said:

" 'Jim Baker of Chicago is here in town, in the market for
salmon, and I think if you can make some concessions I can

get him to take your entire lot.' 'Well,' I says, 'What concessions do you want?' We sat down and discussed the price, and Mr. Brady felt at that time that we ought to make the price, especially on Pinks 62½ cents, and the Medium Reds at 82½ cents as the price, with 2% brokerage and 1½% off for cash to Baker and that he could make the deal; I don't know how long it took us to discuss it back and forth, probably half an hour, and I finally agreed to those terms, provided the sale was made that day, and we went in to the bookkeeper and got the data as to the amount of salmon that was on hand, etc; and Mr. Brady started to leave the office and got to the outer door of the office, and he turned and said, as near as I can recall his words: 'If you don't mind I'll write that letter to Baker, he is waiting for me, and it will save the time of going to my office and back,' and I says, 'There's the typewriter and paper, help yourself,' and he sat down and framed up this letter to Mr. Baker himself and signed it personally, giving us a carbon copy of it, of course.

"If Mr. Brady made the deal that day on the terms and conditions of the sale that was agreed on between us, I was to pay him, or the Admiralty Trading Company, one and one-half per cent.

"Along about noon he came to our office and said that he had seen Baker and that Baker wouldn't take but approximately a half, what we had in Seattle, and I says, 'No, we would not do that,' the deal was made on the basis that he would take every case we had, that left over from the 1912 pack, as well as the 1913. I demurred to this. He wanted an additional one per cent. I says, 'If that is all that is between you on this sale, I am willing to allow it, the one per cent,' and Mr. Brady says, 'Maybe I can see my way clear to stand half.' I understood he was going to see Baker at lunch. Mr. Brady went out and came back in the afternoon, I don't recall just what time, and he came in and says, 'The deal is off, Baker won't take it.' I says, 'All right.' I said something about him bluffing and he says, 'No he isn't, and when we got through he says, 'He looked me straight in the eye and says, 'I don't want these salmon,' and I says, 'All right, that ends it.'

"After this, on the same day, Mr. Brady made me an offer to buy the pack himself. He wanted to buy it, as far as what I have heard, on consignment purchase and sales. It

was discussed and I didn't care particularly about it, but we talked a little about it and he said he wanted to go out and see his bankers; he came back either that afternoon or the next morning and opened up that point and I said, 'No, we wouldn't sell that way at all to any one.'"

George B. Hall testified as follows:

"I was employed by the Admiralty Trading Co. as assistant manager from August, 1912, until March 1, 1914, and had charge of the sale of the salmon of said company. I made two trips for the Admiralty Trading Co. to the east and the last of said trips was from December 20, 1913, to February 10, 1914. I know James R. Baker, a salmon broker of Chicago, and first met him in his office at Chicago, on January 27, 1914. I called at his office about selling the balance of the pack of the Admiralty Trading Co. at the market price at that time. He said that wouldn't do, and that I should make another offer. I told him that I would have to refer him to our manager, Mr. Teal, of Seattle, and he said, 'I will go out there,' and I gave him the address and he said he would call.

"I returned to Seattle on February 12, 1914, and I remember that Mr. Brady called at the office of the Admiralty Trading Company a few days after my return. Mr. Brady said that while Mr. Baker was in town he had asked Mr. Brady to call at the office of the Admiralty Trading Co. and asked him to make an offer for our pack, and Mr. Brady said that he had not been successful in making a sale to Mr. Baker, and that he could not make said sale to Baker on February 5, 1914."

This evidence presents no real conflict. The only definite agreement for the payment of any commission referred to in evidence is that expressed in the memorandum at the foot of the appellant's copy of the letter to Baker. This was written by the respondent himself immediately after the terms of sale and amount of commission had been discussed and when the full understanding must have been distinct in the minds of both parties. Both Teal and the respondent say that the arrangement as to terms of sale and commission was a special

one intended to apply to that particular transaction. It therefore superseded any prior agreement as to commission the existence of which might be implied from the fact that respondent had, prior to that time, been given samples. The memorandum as to the commission would be meaningless but for its reference to "the above deal." That deal, however, as evidenced by its very initial terms, written by the respondent himself, was an offer on February 5th to be accepted that day. This element of time was as much a part of the deal as any other of its terms, and was adopted in the memorandum as effectually as any other part of the proposed deal as the basis of the commission. This is not only the necessary construction of the writing, but the above testimony shows without contradiction that such was the agreement. Teal testified that he finally agreed on these terms, including the commission, "provided the sale was made on that day," and the respondent, though subsequently called to testify in rebuttal, did not deny this. The evidence, both written and oral, therefore stands uncontradicted that the agreement to pay the commission on a sale to Baker on the terms mentioned in the letter was limited to a sale to be consummated on that day. It is also uncontradicted that the last thing done on that day was respondent's report to Teal that he could not make the sale and that the deal was off. A sale was consummated four or five days later without the further intervention of the respondent. There is not a syllable of evidence that a sale on the day limited in the agreement was prevented through any act or interference on the appellant's part. It was not then made, solely because the respondent could not on that day produce a purchaser ready, able and willing to buy on the terms specified.

The law applicable to these admitted facts is well settled. It is nowhere better stated than by Mechem:

"The parties are at liberty to make the payment of commissions dependent upon such lawful conditions and contingencies as please them, and, where no improper advantage

is taken, their express stipulations must prevail, although the result be that the broker finds that he has risked his labor and expenses upon the mere caprice of his employer, as when he undertakes to find a purchaser of property upon terms *satisfactory* to the seller. For many cases no more satisfactory general rule can be laid down than to ascertain, 1. What did the broker undertake to do? 2. Has he completed that undertaking within the time and upon the terms stipulated? and 3. If not, is the default attributable to his own act or to the interference of the principal? If upon such an inquiry it be determined that the broker has performed within the time, and upon the terms, agreed upon, he is entitled to his commissions; if he has not, he is not so entitled, unless the performance was prevented by the principal under circumstances which gave him no right then and so to prevent it. It will be seen from this rule that where the time is limited, the performance must be within *that time;* and the broker will not be entitled to commissions because efforts begun within that time bear fruit after its expiration." 2 Mechem, Agency (2d ed.), § 2427.

The following decisions fully sustain the above text: *Kane v. Dawson*, 52 Wash. 411, 100 Pac. 837; *Barney v. Yazoo Delta Land Co.*, 179 Ind. 337, 101 N. E. 96; *Zeimer v. Antisoll*, 75 Cal. 509, 17 Pac. 642; *Ropes v. Rosenfeld's Sons*, 145 Cal. 671, 79 Pac. 354; *Edwards v. Laird*, 22 Cal. App. 398, 134 Pac. 365; *Slotboom v. Simpson Lumber Co.*, 67 Ore. 516, 135 Pac. 889, 136 Pac. 641, Ann. Cas. 1915 C. 339; *Murray v. Miller*, 112 Ark. 227, 166 S. W. 536; *Fultz v. Wimer*, 34 Kan. 576, 9 Pac. 316; *Brown v. Mason*, 155 Cal. 155, 99 Pac. 867, 21 L. R. A. (N. S.) 328, and note.

The necessary result of the foregoing decisions is that the time limit fixed is of the essence of the contract. There are many decisions directly so holding. *Hicks v. Post*, 154 Cal. 22, 96 Pac. 878; *Watson v. Brooks*, 11 Ore. 271, 3 Pac. 679; *Edwards v. Laird*, and *Barney v. Yazoo Delta Land Co.*, *supra*.

The case of *Colonial Trust Co. v. Pacific Packing & Navigation Co.* (*Corby v. Same*), 158 Fed. 277, mainly relied upon

by respondent, is not applicable to the facts here. In that case, there was no time limit in the contract of agency, except a stipulation that it might be cancelled at the end of sixty days. It was not cancelled before the agent had produced a purchaser then ready, able and willing to buy. The distinction is so apparent as to require no elaboration. The other authorities cited by respondent are equally inapposite.

Judgment reversed, and cause remanded for dismissal.

MORRIS, C. J., MOUNT, HOLCOMB, and MAIN, JJ., concur.